Robert E. Gerkin
J-79986/ 5BA2-34
P.O.Box 950
Folsom,Ca.95763
In Pro Se



ORIGINAL

UNITED STATE DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CV 08          1602

ROBERT E. GERKIN,

          Petitioner,

    v

M.C. KRAMER,Warden,

          Respondent.

MOTION FOR RELIEF OF
JUDGMENT UNDER RULE 60 (b).

      Petitioner, Robert E. Gerkin, duly declares that he resides at the above

address, moves this court Honorable Court, and for Respondent's to take notice

that Petitioner moves for a motion, permitting petitioner permission to file a

request for Relief From Judgment or Order pursuant to 28 USC § Rule 60 (b)(3),

this application will show that he relies on: (1) fraud perpetuated

by the prosecution acting in collusion with the principle witnesses in the use

of hearsay evidence in the misinterpretation of witness exclusion and

providing them with copies of the preliminary examination transcript,(2)

collusion with the expert witness where the prosecution provided the court and

name expert then switched two more names as experts after defense counsel

prepared a defense for the first expert witness,(3) prosecution perpetuated

1

fraud in the use of the expert witness, as the witness had extraneous of the knowledge of the alleged crime, then testified opposite of that information during trial.

The issues in this context are reviewable under Rule 60, as relief form judgment. The (b) section of this rule is in place to insure a petitioner on motion that due process is not violated. Rule 60(b)(3), in particular is appropriate where there are allegation of fraud, (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party.

Fraud may be the urged as the basis for relief by independent action insofar established doctrine permits. In most cases, it has been held that relief from judgment obtained by intrinsic fraud could be secured by motion within a reasonable time, which might be after the time stated in the rule had run. (Hazel-Atlas Glass Co v. Hartford Empire Co.64 S.Ct. 997; Gonzalez v. Crosby 125 S.Ct. 2641(2005).)

The Fourteenth Amendment cannot tolerate a state conviction obtained by knowing use of false evidence. In this case the prosecution made a point of controlling the witnesses and what evidence would be presented at trial in order to secure the desired result guaranteeing a conviction.

### SIXTH AMENDMENT

In all criminal prosecutions, the accused shall enjoy right to speedy and public trial, by an impartial jury of the state and district wherein the the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses in his favor, and to have the assistance of counsel for his defense.

FOURTEENTH AMENDMENT

All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of laws.

The prosecution ensured and encouraged collusive testimony of petitioners right to due process. Also, the Prosecutor committed misconduct by jointly interviewing witnesses, in so much that it prejudiced petitioner. The prosecutor used one name as the source of the expert testimony then shuffled the deck to have another expert propose another that defense counsel was unprepared for. Prosecution, was aware that the expert witness had been the alleged victims one-on-one counselor at the experts place of business when she testified in court that she had no knowledge of the alleged crime.

Courts recognize a prosecutor's broad discretion to initiate and conduct criminal prosecutions, in  part out of regard for the separation of powers doctrine and in part because the decision to prosecute is particularly ill-suited to judicial review. In the absences of contrary evidence, courts presume that criminal prosecutions are undertaken in good faith and in a non-discriminatory manner. (Wayte v. U.S. 460 U.S.598,607(1985).)

In the csae of Gerkin the prosecution did not act in good faith and used its prerogative to bring charges and to use fraud to insure a conviction.

date: 3/20/2008

Resectfully submitted,

ROBERT E. GERKIN

in pro se

3

## FACTS OF THE CASE

On April 3,1995, Petitioner was charged with one count of violating California Penal Code § 273.5(spousal battery) and one count of P.C. § 422(uttering terrorist threats). On August 29,1995, a jury found petitioner guilty of violating P.C. § 273.5, and not guilty of violating P.C.§ 422, and sentenced him to 25 years to life.

Petitioner filed a timely appeal (Case No. H014599) and a petition for writ of habeas corpus (Case No.H014599) in conjunction with the appeal in the Sixth Appellate Court of California. On July 18,1997, the appellate court vacated petitioner's judgment of conviction, but remanded his case for re-sentencing pursuant to People v. Romero 13 Cal 4th 497(1996). On that same date the state court of appeals denied the habeas petition, which had been consolidated with the direct appeal, without prejudice to filing a petition for writ of habeas corpus in the superior court regarding his claim of jury misconduct.

After conducting a sentencing hearing, the trial court denied petitioner's request to strike a prior conviction(s) pursuant to Romero. Petitioner filed a second timely notice of appeal on March 20,1998. In addition to his second appeal (Case No. H018293), on February 28,1998, petitioner filed a second petition for writ of habeas corpus in the state court of appeals. The petition was summarily denied on September 21,1998, and the court of appeal affirmed (Case No. H018293), petitioner filed a petition for writ of habeas corpus in the superior court on May 14,1998, concerning his claim of jury misconduct. On May 19,1998, the superior court denied the petition after finding that it lacked jurisdiction to consider the petition because petitioner's case was pending on appeal after remand pursuant to Romero,supra. Petitioner's petition for review was denied (Court of Appeals No. H018293) on May 21,1999.

4

On September 28,1999, petitioner filed a second petition for writ of habeas corpus in the Superior Court. On October 29,1999,the superior court denied the petition without prejudice on grounds that it was incomplete because it did not include the exhibits attached to the petition that was filed in the court of appeal(Case No. H016538). Petitioner then re-filed a petition for writ of habeas corpus and the Superior Court issued an Order to Show Cause on January 25,2000.

After conducting a hearing the matter was remanded to the trial court in this case for a hearing in regards to jury misconduct. On July 14,2000, the trial judge denied the petition without conducting an evidentiary hearing. Petitioner was denied review in the State Supreme Court on May 23,2001.

On August 8,2001, filed a petition for writ of habeas corpus U.S. District Court, Northern District of California (CV-01-20766-JF), and denied December 19,2003. A Motion for Certificate of Appealability was filed on January 8,2004, that was denied January 14,2004.

On January 28,2004, notice of Appeal was filed in the U.S. Court of Appeal for the Ninth Circuit, The court granted permission to appeal February 4,2004, and denied August 1,2005. On September 28,2006,filed a motion for a second or successive petition in the Court of Appeals after bringing fourth two new ground in the Superior Court of California and the subsequent state court and exhausting those issues.

A petition for Cerioriari was filed in. Supreme Court of the United States February 6,2006 that was denied March 20,2007.

I

THE PROSECUTION COMMITTED MISCONDUCT BY CONVINCING THE COURT IT DID NOT HAVE TO EXCLUDE ANY OF THE PROSECUTION'S WITNESSES FORM THE PRELIMINARY EXAMINATION.

The Defense Counsel made a routine motion under Cal. Penal Code § 867, to exclude all witnesses form the courtroom during preliminary examination. The only witness that was excluded was a defense witness that had potential exculpating evidence, based on statement made over the telephone by the hearsay witness over the telephone the night the incident occurred. All of the evidence in this case was gathered over the telephone. The court designated her a potential witness and excluded her from the courtroom.

The defense counsel requested all other witnesses be excluded. Because one of the witnesses had spoken to the defense witness, so out of caution the request was placed again. Counsel stated that these witnesses may be called to impeach the testimony of the principle witness. As again the charges were based entirely on hearsay evidence heard over the telephone.

The prosecution stated that it did not intend to call any of the other witnesses present in the courtroom.

Defense Counsel made the request again under Cal.Penal Code § 867, and was told by the court could he offer any proof the state witnesses would offer. All Defense Counsel could say was"they have been ensconced with the District Attorney and the other prosecution witnesses in a room just to the Courts right." (See Roviaro v. U.S. 353 U.S. 53[77 S.Ct. 623]).

The Court in Roviaro said, in a prosecution for drug transportation, makes mention of the prosecutions control and flow of information to the defense from the state witnesses that is essential to due process. In this case, prosecution's sequestered the witnesses, effect withholding any opportunity for the defense to question the witnesses until they entered the courtroom at the start of the preliminary examination. This could be considered a Bardy violation.(Bardy v. Maryland 373 U.S. 83 (1963).) In Bardy

6

to sequester the state witnesses from the defense is equal to withholding
discovery.

CALIFORNIA PENAL CODE § 867:

" While witness is under examination, the magistrate upon motion of either
party exclude all potential and actual witnesses who have not been examined.
Either party may challenge the exclusion of any person under this section.
Upon motion of either party, the magistrate shall hold a hearing, on the
record, to determine if the person sought to be excluded is, in fact, a person
excludable under this section."

When the conviction occurs at the state level that involves a state
constitutional statute, the standard of review must be viewed through the
prism of Hicks v. Oklahoma 447 U.S. 343 (1980)[65 L.Ed.2d. 175]. The court
must view the statutory rule as written. In this case, it cannot be argued the
the denial rights are exclusively a state concern. The prosecutor withheld the
witnesses as an act of bad faith.

A pretrial preparation the prosecutor took a copy of the preliminary
examination transcript to the witnesses home. The prosecutor discussed how to
present the testimony then left the transcript for then to review and discuss
how and what to testify too in court.

In effect the prosecution the prosecutor coached the witnesses there by
manifesting a miscarriage of justice.

II

THE PROSECUTION ACTED IN COLLUSION WITH THE EXPERT WITNESS TO EXPOUND A THEORY
DEVELOPED BY THE WITNESS AND HER BUSINESS PARTNER AT THERE ANGER MANAGEMENT
CLINIC.

The prosecution waited until the day before the state of trial to say
they intended to call Richard Ferry as an expert on Battered Woman Syndrome.
This is a Brady violation that also,a violation of FRCP rule 16(a). The court
conceded that the prosecution was negligent in complying with the rules of
discovery, but postponed in order that Trial Counsel could prepare for this
expert testimony.

Trial Counsel could not contact Richard Ferry atfer numerous attempts, he

7

was sent a copy of transcribed testimony was sent. Shortly thereafter his recived an unreadable transcript from Dr.Barbara Krzyczkowska.

The switch had occurred.

Unable to read the transcript of Dr.Krzyczkowska, counsel could not prepare a defense. When the expert showed to testify at trial, it was a person named Joanne Harwick there to render expert testimony and expound a new battered woman syndrome theory. An cat of bad faith.(U.S. v. Fisher 106 F3d. 622,635 (5th Cir. 1997). A Brady violation occurred because the delay precluded from making meaningful use of the evidence.

This is a clear case of trial by ambush. In the first instant, the court did not sanction the prosecution for late disclosure of the expert witness. The court granted a postponement for the defense to familiarize itself with Richard Ferry's method and jargon. At the resumption of the trial, the court would not any further delays. Prosecution had to resort to other tactics. Second, prosecution sent Dr.Krzyczkowska's unreadable transcript to study. Then on the day of trial, the expert that was totestify Dr. Krzyczkowska was replaced by another expert, one Joanne Harwick.

The tactic prejudiced petitioner, the court concluded that the issue was not as complex as DNA testimony and allowed her testimony. She testified that victim recantation is a sign of domestic violence.(Namet v. U.S.373 U.S. 179, 186 (1963).) The testimony given by the victim was to recant, after she pled the Fifth Amendment and wasgiven immunity during the preliminary examination.

The prosecutions misconduct violated the state's and federal discovery rules and created a miscarriage of justice. which also violates F.R.C.Pro. rule 16(c)(d)(2).

8

III

THE PROSECUTION KNEW OR SHOULD HAVE KNOWN THAT JOANNE HARWICK HAD BEEN FULLY APPRISED OF WHAT THE ALLEGED VICTIM SAID TO HAVE OCCURRED THE NIGHT THE INCIDENT, BECAUSE SHE WAS THE ALLEGED VICTIM'S ONE-ON-ONE COUNSELOR AT HARWICK'S ANGER MANAGEMENT CLINIC, THE WHEN ON TO MISREPRESENT THE FACTS OF THE CASE.

The Prosecution perpetuated a miscarriage of justice in violation of the Fourteenth Amendment Due Process. The prosecutor should have known the expert witness had signed a contract to treat the Alleged Victim for her anger management problems.

The expert witness had interviewed the alleged victim in detail, going over all of the facts that the alleged victim testified to after she was granted immunity, when she recanted the basis for the offense charged. This interview was taken months before the start of the of the trial.

The alleged victim has filed an affidavit stating," she was specifically asked not to attend court on the day the expert was to testify." The alleged victim was unaware that an expert witness would testify on this day. The alleged victim was curious as to why on this one day she was specifically not to attend the trial,as the prosecutor did not want the alleged victim to appear.

When the alleged victim made an appearance in the courtroom, it was to find her one-on-one counselor speaking with the defense counsel and the prosecutor.

In the courtroom the prosecutor questioned Harwick along the lines closely paralleling the facts of the case and then both prosecutor questioned Harwick whether she knew the alleged victim and anything about the facts of this case. Harwick conceded that the alleged victim's name sounded familiar but she denied knowing her or anything about the particular facts of this case.(See Napue v. Illinois 360 U.S. 264[79 S.Ct. 1173] (1954).

The Napue Court held "A conviction obtained through use of false

9

evidence, known to be such by the state, must fall under the due process clause of the Fourteenth Amendment; the same result obtains when the state, although not soliciting false evidence, allows it to go uncorrected when it appears."

The due process principal that a state may not knowingly use false testimony to obtain a tainted conviction does not cease to apply merely because the false testimony goes only to the creditability of the witness. In determining whether a state conviction obtained through use of false testimony violates the due process clause, the United States Supreme Court is not bound by a determination by the state court below that the false testimony could not in any reasonable likelihood have affected the judgment of the jury.

## CONCLUSION

In conclusion the prosecution's misconduct perpetuated a miscarriage of justice when it encouraged the witness to give collusive testimony and then switch the expert witness and encourage the same expert witness to misrepresent the facts thereby rendering fraudulent testimony.

date:

3/20/2008

Respectfully submitted,

ROBERT E.GERKIN
IN PRO SE

# APPENDIX 1

## DECLARATION OF DEBBIE ALLEY GERKIN

I, Debbie Alley Gerkin, am the wife of Robert Eugene Gerkin, and the alleged victim of domestic violence in the case that led to his conviction and 25-year-to-life sentence. Because I was afraid that Robert would be wrongfully convicted, despite the recantation of my allegation that he hit me on the night of February 4, 1995, I tried at every opportunity to influence the jurors and persuade them that Robert was not guilty.

I was extremely frustrated with the court proceedings because Robert was being prosecuted for something that he had not done. I had tried to set the record straight by recanting my allegation that Robert hit me but the District Attorney continued to prosecute Robert. Because I felt so strongly that this was wrong and that Robert's attorney, Dennis A. Lempert, was doing a poor job of representing him, I took the matter into my own hands and tried to influence the jurors by telling them that the charges were false and Robert would go to jail for 25 years to life under the "Three Strikes" law if he was convicted.

During the breaks in the trial, I went outside to smoke cigarettes. On one occasion, I confronted a female juror who sat in the front row of the jury and who also went outside at nearly every break to smoke cigarettes. This juror tried to avoid me but I "danced" around her and prevented her from getting away from me. I told this juror that Robert was not guilty, the jury was not being allowed to hear the whole story, and Robert was subject to the "Three Strikes" law and would go to prison for 25 years to life if convicted. This juror told me to leave her alone because she said they were being watched.

On another occasion, I confronted four to six jurors near the elevator just outside the court room and repeated that Robert was subject to the "Three Strikes" law if convicted, that I lied to the police by saying that Robert hit me, and that Robert would go to prison for 25 years to life if wrongly convicted of the charges in this case. This encounter was brief but

Declaration Of Debbie Alley Gerkin
Page 2

I am sure the jurors heard me because they made eye contact with me as I spoke to them.

Finally, I tried to influence the jurors and hence their deliberations at every opportunity by confronting jurors whenever I could. I was getting very desperate as the trial progressed because I felt that Robert was going to be wrongly convicted and that his trial counsel was doing such a poor job of representing him. Therefore, I decided that Robert's only hope for acquittal was for me to talk with the jurors directly and try to convince them through this contact that Robert was not guilty and that I had lied by saying that he hit me.

In addition to the above, I knew that the prosecutor was going to argue that I had many bruises during the time that I was with Robert. I told Lempert two things regarding my bruises. The first was that I have a history of being anemic and this causes me to bruise more easily. In addition, I told Lempert that I liked holding garage sales and that I often looked through dumpsters to find discarded items that I could sell. I told Lempert that I often got hurt while looking through the dumpsters and that the bruises were caused by my anemia and this activity and not because Robert hit me. Lempert said that he would not introduce evidence that I looked through dumpsters for items to sell. According to Lempert, he would not introduce this evidence because it was "too embarrassing."

Also, I told Lempert in May 1995, long before the start of Robert's trial that I had seen Joanne Harwick for help in managing my anger and to prevent myself from losing custody of my daughter. On May 10, 1995, I executed a release for information so that Lempert could get my records from Joanne Harwick's office. (Appendix 11.)

After I testified, I spoke with Lempert one particular day during the trial. Then, Lempert told me to stay home the next day but to remain

Declaration Of Debbie Alley Gerkin
Page 3

available by phone. According to Lempert, it would not be good to have me present in court that day.

Because of my feelings about Lempert and my tendency to be independent, I came to court anyway. As I was sitting in the hallway outside of the court room, I saw Lempert leave the court room with the prosecutor and Joanne Harwick, the counselor that I saw four months earlier for anger management. I was shocked and demanded that Lempert tell me what Harwick was doing in court that day. Lempert responded by telling me that I was not supposed to be in court that day and that he told me to stay home.

At first, I was pleased because I thought Lempert had subpoenaed Harwick to testify about my psychological problems. However, Lempert told me that the prosecution had called Harwick as its expert witness on the Battered Woman's Syndrome.

I was very upset because Harwick, the person I saw for counseling purposes, was being called as a witness against Robert. When told that Harwick denied knowing me, I got even more upset and Lempert took me into a room along with Harwick. Harwick conceded that I looked familiar but said she had to check her files to determine if I had ever been her patient. I gave Lempert the paperwork that I received from Harwick to establish that I had seen her for counseling purposes. Based on my understanding at the time, Harwick had already testified for two days as the prosecution's expert on the Battered Woman's Syndrome.

I declare under penalty of perjury that the foregoing is true and correct. Executed on _Feb. 26_____, 1997, at _San Jose_____, California.

_Debbie Alley-Gerkin_

DEBBIE ALLEY GERKIN

## **APPENDIX 2**

# DECLARATION OF MANUEL J. BAGLANIS

I, Manuel J. Baglanis, have been appointed on appeal to represent appellant and petitioner, Robert Eugene Gerkin.

After my appointment, I spoke with petitioner's wife, DEBBIE ALLEY GERKIN, who told me that she had a number of unauthorized contacts with the jurors in petitioner's case. According to Debbie, she sought out and made these contacts for the purpose of influencing the jury's deliberations in this case. The goal was to persuade the jurors to acquit petitioner of the charges against him.

I met with Debbie on January 30, 1996, and tape recorded her statement about her jury contacts. The taping was done with the recorder in plain view and with Debbie's knowledge and full consent.

According to Debbie, she sought out jurors at every opportunity in an attempt to influence their decisions in the case. In this regard, she advised the jurors that she lied to the police and others by saying that petitioner hit her on February 4, 1995, and she disclosed that petitioner was subject to the "Three Strikes" law and a sentence of 25 years to life if convicted of the charges against him.

I also met with petitioner's sister, JOANNE BARRIES, that same day and tape recorded her statement, again with the recorder in plain view and with her consent and full permission. Then, Joanne told me that she also had unauthorized contacts with jurors. According to Joanne, she did not know at the time of her contact that she was discussing petitioner's case in front of the jurors.

During her contact with the jurors, Joanne discussed her opinion that Debbie was a liar and it was unfair that petitioner was subject to the "Three Strikes" law and a 25-year-to-life sentence if convicted of the charges against him. According to Joanne, she told petitioner's trial attorney, Dennis Lempert about her contact. Lempert told her that her contact was wrong and never to do anything like that again. Based on my review of the record on

Declaration Of Manuel J. Baglanis
Page 2

appeal, Lempert never advised the trial court of his conversation with Joanne.

I talked with Lempert by telephone on December 8, 1995, about petitioner's case. Then, Lempert told me that he had no idea that Debbie had contacted the jurors in petitioner's case and tried to influence their deliberations. However, Lempert did say that he was not surprised because Debbie was a poster person for what happens to someone who abuses drugs. In addition, Lempert said that Debbie often stormed out of the court room and slammed the door behind her in disgust so he felt it was "possible" that Debbie would try to influence the proceedings by out-of-court contact with jurors. Because I had not learned of Joanne's contact with jurors at the time of this conversation, I did not discuss Joanne's statement that she told Lempert of her jury contact just after it occurred.

Petitioner and his family were greatly concerned about Lempert's representation. Given the frequency and extent of their concerns, I wrote Lempert on January 17, 1996, and asked to review his records concerning petitioner's case. (Appendix 4.) Lempert wrote back on January 23, 1996, and said I could have access to the pleadings, correspondence and transcripts in the case but not his attorney work product. (Appendix 6.) I spoke with Lempert by telephone on January 25, 1996, at approximately 4:30 p.m. and Lempert said that I could have everything in his file, except his work product.

I wrote Lempert on January 31, 1996, and again requested all of petitioner's records pursuant to The State Bar of California's Standing Committee on Professional Responsibility and Conduct Formal Opinion No. 1992-127. (Appendix 5.) After this, Lempert wrote back on February 5, 1996, and said that he would direct his staff to retrieve petitioner's records and that he would make the records [file] available to me. (Appendix 7.)

Declaration Of Manuel J. Baglanis
Page 3

I recall another telephone conversation with Lempert, around the time he decided to give me petitioner's files. However, I have not been able to locate my notes from this conversation. Accordingly, I am unable to provide the specific time and date of this call.

In any event, I recall Lempert asking during this conversation whether I also wanted the information in his files concerning his fee arrangements for representing petitioner. I recall telling Lempert that I was aware that Lempert was suing petitioner's parents for unpaid fees, that I wanted to avoid getting embroiled in this issue, and he could eliminate the information concerning fee arrangements from the files that he was going to give me.

After reviewing the record on appeal, Lempert's files, and filing petitioner's Opening and Reply Briefs, I wrote Lempert on November 12, 1996, and detailed my concerns about the adequacy of his representation. (Appendix 8.) Then, I asked Lempert to prepare a declaration executed under penalty of perjury regarding the concerns outlined in my letter. (Appendix 8.) Lempert responded in a letter dated November 20, 1996. (Appendix 9.) In this letter, Lempert asked why I wanted a declaration executed under penalty of perjury, he questioned some of the representations I made regarding our telephone conversation of December 8, 1995, and he disputed other portions of my letter dated November 12.

I responded in a letter dated November 25, 1996. (Appendix 10.) Then, I advised Lempert that I was preparing a petition for writ of habeas corpus challenging his performance in many areas and also that I wanted to place all relevant evidence before the Court of Appeal regarding the unauthorized jury contacts by Debbie Gerkin and Joanne Barries. To date, I have not received any reply from Lempert or his office.

After speaking with Debbie Gerkin, I prepared a release of psychological information that was directed to Joanne Harwick, LMFCC.

59

Declaration Of Manuel J. Baglanis
Page 4

Debbie signed this release on October 13, 1996, and this was sent by facsimile to Harwick on October 24, 1996. (Appendix 11.)

Approximately one week later, I received a packet from Harwick via certified mail postmarked October 29, 1996. This packet contained many items, most of which were not contained in petitioner's file that I received from Lempert's office. In this regard, the mail packet contained records of Debbie's visit to Harwick's office on April 21, 1995, four months before Harwick testified as the prosecution's expert witness on the Battered Woman's Syndrome.

On the form entitled "Domestic Violence Counseling and Intervention Program Registration," Debbie disclosed to Harwick that petitioner was the victim of domestic violence; she had a psychiatric history dating from age 13; she had suicidal ideations; she drank alcohol and used methamphetamine and marijuana; she had been in a relationship with petitioner for five to six years; she had several relationships when younger, one of which ended when her boyfriend committed suicide; she was sexually abused as a child; she witnessed her mother swearing and yelling at others and hitting them with objects and believes her mother is deceitful; the incident that triggered problems with petitioner began when she took her daughter to Oregon to see her mother and she thought petitioner had an affair while she was gone; her belief that petitioner was unfaithful caused her to think about killing him and herself; she was drinking and doing drugs with her girlfriend and threw a phone at petitioner and it came back to hit her; she went to the police and reported that petitioner had hit her; Debbie told Harwick that petitioner was facing 25-year-to-life 50 years if convicted and she thought about killing herself for falsely accusing him; and, Debbie disclosed in the balance of the form the types of physical abuse she inflicted on petitioner. (Appendix 11.) Finally, Harwick noted that Debbie was a "Suicide Risk" and that she had a past history of violence and abuse

Declaration Of Manuel J. Baglanis
Page 5

as a child. (Appendix 11.) Finally, Harwick noted that Debbie appeared to be tense and anxious and that while Debbie denied being a victim, she presented as someone with Post Traumatic Stress Disorder. (Appendix 11.)

This form and a form entitled "Community Psychotherapy Institute Domestic Violence Counseling and Intervention Services Contract for Participation" were not included in Lempert's files. Further, Lempert's files did not include an "Authorization for Release of Information" directed to "Community Psychotherapy Institute" [Joanne Harwick's company] that Debbie signed on May 10, 1995. Instead, this release was contained in the packet received from Harwick. In this regard, the form reflects that Lempert's office waited until August 25, 1995, after Harwick testified [or during the last moments of her testimony], to send her office the release of information that Debbie signed more than three months earlier. (Appendix 11.) The omission of the records sent by Harwick from Lempert's files is noteworthy because his file included other releases of information that Debbie signed on May 10 and 22, 1995, [releases for her Juvenile records, and for her medical records from Drs. DeFigard and Silverstein and O'Connor Hospital. (Appendix 12.)

In addition, Debbie informed me that she had a history of anemia and told Lempert that she bruised easily as a result of this medical condition. In the files received from Lempert, in a folder entitled "Meds" I located a report from Allied Laboratories, Inc. (Appendix 13.) In this report., Alley's the Chemistry section of the report indicates that Alley's blood levels of Iron were "Border Line." (Appendix 13.) Further, the laboratory number of 167 was underlined which presumably evidenced its importance to medical personnel.

Finally, I was appellate counsel in *People v. Gilbert* (1992) 5 Cal.App.4th 1372. Based on my involvement in that case, I know that

61

Declaration Of Manuel J. Baglanis
Page 6

_____

Lempert was trial counsel in *Gilbert*, a case involving the Child Sexual
Abuse Accommodation Syndrome.

I declare under penalty of perjury that the foregoing is true and
correct and is in part based on information that I believe to be true.
Executed on February 27, 1997, at Cupertino, California.

Manuel J. Baglanis

**APPENDIX 3**

1    SAN JOSE, CALIFORNIA                          AUGUST 24, 1995

2                    PROCEEDINGS

3            THE COURT:  FOR THE RECORD, THE JURORS ARE

4    PRESENT, WITNESS HAS RESUMED THE WITNESS STAND.  THE

5    DEFENDANT IS HERE, THE LAWYERS ARE HERE.

6            I REVIEWED TWO NOTES FROM YOU THIS MORNING.  I

7    HAVE NOT HAD THE CHANCE TO SHOW THEM TO THE ATTORNEYS YET.

8    I WILL DO THAT AND YOU WILL HAVE AN ANSWER TO YOUR QUESTIONS

9    SOMETIME THIS MORNING.

10            PLEASE, PROCEED.

11            MR. ANDERSON:  THANK YOU, YOUR HONOR.

12                    JOANNE HARWICK,

13    CALLED AS A WITNESS ON BEHALF OF THE PEOPLE, HAVING BEEN

14    PREVIOUSLY DULY SWORN, TESTIFIED FURTHER AS FOLLOWS:

15                DIRECT EXAMINATION (RESUMED)

16    BY MR. ANDERSON:

17    Q    MS. HARWICK, WHEN WE WERE TALKING ABOUT CYCLE OF

18    VIOLENCE, YOU TOLD US THAT THERE WERE THREE STAGES TO THIS.

19            YOU TALKED -- IS THERE ANY PARTICULAR TIME BETWEEN THE

20    OCCURRENCE OF THESE CYCLES IN A RELATIONSHIP?

21    A    YOU MEAN -- I DIDN'T QUITE UNDERSTAND THE QUESTION.

22    Q    YOU SAY THAT THERE WAS A BUILD UP AND THEN THERE WAS

23    THE EXPLOSION AND THEN THERE WAS THE HONEYMOON OR RESPITE

24    STAGE?

25    A    UH-HUH.

26    Q    NOW, IS THERE A PERIOD IN BETWEEN THESE RECURRING

27    CYCLES?

28    A    THERE IS A PERIOD THAT BECOMES SHORTER OVER TIME.  IN

1    THE END. USUALLY SHE LEAVES -- THE POINT WHERE SHE BELIEVES

2    SHE WILL BE KILLED IF SHE STAYS IS WHEN SHE LEAVES. THAT IS

3    ONE OF THE MOTIVATORS FOR LEAVING, IS THAT I WILL NOT

4    SURVIVE THIS. IF SHE HAS NOT MINIMIZED OR DENIED THAT FACT.

5    Q  IS THERE A PARTICULARLY DANGEROUS TIME FOR THE BATTERED

6    WOMEN'S SYNDROME TO LEAVE A RELATIONSHIP?

7    A  ANY TIME SHE LEAVES IS DANGEROUS. STUDIES SHOW THAT

8    WOMEN WHO HAVE BEEN MURDERED BY THEIR PARTNERS, SEVENTY

9    PERCENT WERE MURDERED WHEN LEAVING THE RELATIONSHIP, EITHER

10   HAVING EXPRESSED AN INTENTION TO LEAVE OR ACTUALLY LEFT, OR

11   AFTER LEAVING, MADE SURE THAT THE LEAVING WAS FINAL.

12     IN OTHER WORDS, THERE'S THIS SORT OF LIMBO STAGE. WHEN

13   THAT LIMBO IS NO MORE THERE, THAT IT'S CLEAR SHE'S NOT

14   RETURNING, SHE IS IN TERRIFIC DANGER. AND WE WORK WITH

15   WOMEN ON SAFETY PLANS. THAT SHE HAS TO GET STRONG ENOUGH TO

16   LEAVE WITHOUT HIM KNOWING SHE'S STRONG ENOUGH. CAUSE THIS

17   CHANGE IN HER INDEPENDENCE, ANY STEP TOWARDS TAKING CHARGE

18   OF HERSELF, WILL BE MET WITH INCREASED VIOLENCE AND SHE WILL

19   BE TOLD IT'S NOT GOING TO WORK.

20   Q  DO YOU KNOW -- DO YOU KNOW DEBBIE ALLEY?

21   A  NO.

22   Q  HAVE YOU EVER HEARD THE NAME BEFORE?

23   A  THE NAME ALLEY IS FAMILIAR. I DON'T KNOW A DEBBIE

24   ALLEY OR I DON'T HAVE AWARENESS OF KNOWING DEBBIE ALLEY.

25   Q  DO YOU KNOW A PERSON NAMED ROBERT GERKIN?

26     THE COURT: IF YOU WILL APPROACH THE BENCH,

27   PLEASE.

28     EXCUSE US FOR A FEW MINUTES. PLEASE HAVE SOME

```
 1    LIGHT CONVERSATION.
 2              (OFF-THE-RECORD DISCUSSION.)
 3          THE COURT:   IT WAS A SHORT CONVERSATION AT THE
 4    BENCH, SO I'M SORRY YOU JUST HAD TIME TO GET THE NEWSPAPERS
 5    OUT AND NOW YOU HAVE TO PUT THEM BACK DOWN.
 6    Q    (BY MR. ANDERSON)  DO YOU KNOW A PERSON NAMED ROBERT
 7    GERKIN?
 8    A    I'M TRYING TO REMEMBER.  THERE ARE -- I'VE HAD OVER ONE
 9    THOUSAND MEN THAT I'VE WORKED WITH AND --
10    Q    YOU DON'T RECALL AT THIS POINT?
11    A    NO.
12    Q    YOU'RE BEING PAID TO APPEAR AND TESTIFY, AREN'T YOU?
13    A    YES, I AM.
14    Q    AND WHO ARE YOU BEING PAID BY?
15    A    AS I UNDERSTAND, BY THE COUNTY OF SANTA CLARA.
16    Q    AND HOW MUCH ARE YOU RECEIVING?
17    A    I'M RECEIVING THREE HUNDRED AND FIFTY DOLLARS FOR EACH
18    HALF DAY OR PART OF A HALF DAY THAT I'M HERE.
19         MR. ANDERSON:  I HAVE NO FURTHER QUESTIONS OF THIS
20    WITNESS AT THIS TIME.
21         THE COURT:   CROSS-EXAMINATION.
22         MR. LEMPERT:   THANK YOU, YOUR HONOR.
23                   CROSS-EXAMINATION
24    BY MR. LEMPERT:
25    Q    WELL, WHEN YOU SAY THE COUNTY OF SANTA CLARA, ARE YOU
26    PAID BY THE DISTRICT ATTORNEY'S OFFICE, CORRECT?
27    A    I'M ASSUMING THAT'S THE DIVISION THAT IT'S COMING OUT
28    OF, YES.
```

1    Q     THIS IS NOT THE FIRST TIME YOU'VE TESTIFIED ON BEHALF

2    OF THE DISTRICT ATTORNEY, IS IT?

3    A     YES, IT IS.

4    Q     ALL RIGHT.  HAVE YOU EVER TESTIFIED FOR THE DEFENSE IN

5    A BATTERED WOMEN'S CASE?

6    A     NO, I HAVE NOT.

7    Q     SO WOULD IT BE FAIR TO SAY THAT THIS IS YOUR FIRST

8    CRACK AT BEING AN EXPERT WITNESS?

9    A     IN DOMESTIC VIOLENCE, CORRECT.

10   Q     CONGRATULATIONS.

11         CAN YOU TELL ME IN WHAT CONTEXT THE BATTERED WOMEN'S

12   SYNDROME WAS FIRST USED IN COURT?

13   A     NO, I CANNOT.

14   Q     ARE YOU AWARE THAT THE FIRST TIME IT WAS USED WAS IN

15   THE DEFENSE OF A WOMEN WHO HAD KILLED SOMEONE, WHO WAS

16   ALLEGEDLY BATTERING HER?

17   A     NO, I'M NOT.

18   Q     ARE YOU FAMILIAR WITH AN ANNA KUHL?

19   A     YES, I AM.

20   Q     HAVE YOU EVER STUDIED UNDER HER OR WITH HER?

21   A     NO, I'VE TALKED WITH ANNA KUHL.  SHE SOUGHT ME OUT WHEN

22   SHE FIRST CAME TO CALIFORNIA.

23   Q     IS SHE SOMEONE THAT YOU RECEIVE INFORMATION FROM AND

24   ASSISTANCE FROM AND KNOWLEDGE FROM AND IMPART THE SAME TO

25   HER?

26   A     NO.  I HAVE IMPARTED INFORMATION TO HER ABOUT CHILD

27   SEXUAL ABUSE.  THAT WAS APPROXIMATELY TEN TO FIFTEEN YEARS

28   AGO.

BEATRICE S. VALDIVIA, C.S.R. 6610

1    CONTRARY TO COMMON SENSE, THAT THEY ARE NECESSARILY BATTERED

2    WOMEN?

3    A    THERE ARE PEOPLE WHO BEHAVE CONTRARY TO COMMON SENSE

4    WHO ARE NOT BATTERED.

5    Q    OKAY.  SO THE FACT THAT SOMEBODY BEHAVES IN A

6    PARTICULAR WAY, WHICH IN SOME OTHER PERSON MAY BE INDICATIVE

7    OF BEING A BATTERED WOMEN, IN THE CASE OF SOMEBODY ELSE,

8    MIGHT NOT BE INDICATIVE OF BEING A BATTERED WOMEN, CORRECT?

9    A    IT WOULD PROBABLY BE INDICATIVE OF A MENTAL ILLNESS.

10    Q    OKAY.  IN YOUR PRACTICE, IF SOMEBODY COMES IN AND SAYS

11    OR EXPRESSES TO YOU, I AM LIVING WITH SOMEBODY AND THEY HIT

12    ME, AND I'M AFRAID AND I'M CONFUSED, AND THEY DON'T HIT ME

13    ALL THAT HARD AND THEY DON'T HIT ME ALL THAT OFTEN, JUST

14    THOSE FACTS ALONE, COULD YOU DIAGNOSE THAT PERSON AS A

15    BATTERED WOMEN?

16    A    NOT ON THOSE FACTS.  I FIND IT DIFFICULT THOSE FACTS

17    WOULD BE PRESENTED THAT WAY BY A BATTERED WOMEN, BUT ON

18    THOSE FACTS, NO.

19    Q    YOU WOULD HAVE TO DO OTHER THINGS IN TERMS OF MAKING A

20    DIAGNOSIS THAT THIS PERSON IS OR IS NOT A BATTERED WOMEN, IN

21    ORDER TO REACH A PROFESSIONAL CONCLUSION, RIGHT?

22    A    THAT IS CORRECT.

23    Q    AND BEING HERE AS AN EXPERT, YOU ARE SPECIFICALLY ASKED

24    I SUPPOSE BY THE DISTRICT ATTORNEY, NOT TO GET INVOLVED IN

25    THE PEOPLE IN THIS CASE, CORRECT?

26    A    I DON'T KNOW IF I WERE ASKED, BUT I AM ASSUMING THAT AS

27    AN EXPERT WITNESS, I SHOULD NOT BE INVOLVED WITH THE PEOPLE

28    IN THIS CASE.

```
1    Q    AND, IN FACT, NEITHER MR. ANDERSON NOR ANYBODY ELSE

2    FROM THE DISTRICT ATTORNEY'S OFFICE HAS GIVEN YOU ANY POLICE

3    REPORTS IN THIS CASE, CORRECT?

4    A    ABSOLUTELY NOT.

5    Q    NOR HAS ANYBODY FROM ANYBODY IN THIS CASE SAT DOWN AND

6    EXPLAINED TO YOU THE FACTS OF THIS CASE, CORRECT?

7    A    CORRECT.

8    Q    OR THE CONDUCT OF ONE OR MORE OF THE PARTIES IN THIS

9    CASE, CORRECT?

10   A    CORRECT.

11   Q    YOU ARE, AS IT RELATES TO THIS CASE, AND I DON'T MEAN

12   THIS TERM IN A DEROGATORY WAY, A BLANK SHEET OF PAPER?

13   A    YES.  I KNOW NOTHING OF THIS PARTICULAR CASE.

14   Q    SO YOU ARE MERELY TESTIFYING AS TO GENERAL PRINCIPLES

15   OF THE THEORY THAT YOU HOLD?

16   A    THE THEORY I HOLD, AND I WOULD LIKE TO ADD, SHARED BY

17   MANY OTHER PEOPLE.

18   Q    YES.  OBVIOUSLY, YOU'RE NOT ALONE --

19   A    THANK YOU.

20   Q    -- IN YOUR BELIEF.

21        IN YOUR CLINICAL PRACTICE, BEFORE YOU MAKE A DIAGNOSIS,

22   I TAKE IT, YOU SUBJECT THE PERSON, AND AGAIN I DON'T MEAN

23   SUBJECT IN A NEGATIVE WAY, BUT YOU EXAMINE THE PERSON THAT

24   COMES TO YOU TO SEE WHAT IS GOING ON WITH THEM?

25   A    WE USE A FORM CALLED A PSYCHO-SOCIO ASSESSMENT.

26   Q    WOULD THAT INCLUDE A FORM CALLED THE MMPI?

27   A    NO.  WE DO NOT NECESSARILY DO AN MMPI.

28   Q    HOW ABOUT A CPI?
```

## AUTHORIZATION TO RELEASE PSYCHOLOGICAL RECORDS

Joanne Harwick, LMFCC, is authorized to release copies of any and all psychological records for Deborah Alley Gerkin to Manuel J. Baglanis, the court appointed attorney for Robert Eugene Gerkin.

This release is valid for one year from the date signed below. I understand that these psychological records will be used only in the court matter now pending in the Court of Appeal, Sixth Appellate District.

A photocopy or facsimile of this Authorization will be deemed as valid as the original signed copy.

_Deborah Alley Gerkin_     10-13-96

Deborah Alley Gerkin          Date

# COMMUNITY PSYCHOTHERAPY INSTITUTE
## DOMESTIC VIOLENCE COUNSELING AND INTERVENTION SERVICES
### Contract for Participation

Name___Webbie Ally_____  Date___4/21/95_____

Case No.___N/A_____  Probation Officer___N/A_____

I agree to the following conditions of participation in the Domestic Violence Counseling and Intervention Program:

1. I agree to attend two orientation sessions at 940 Saratoga, Suite #__105____ on Weds, 5/3/95____ and Weds  5/10/95____. These are part of the 52-week 7:00 program and are two-hour sessions without a break. 9:00

2. I agree to attend 50 weekly sessions starting _Weds   5/17/95____. These are two-hour sessions without a break.

3. I agree to attend two one-hour individual sessions during the 52-week program, the time for this will be arranged, the cost will be my per session cost plus $5.

4. I understand that if I miss more than two (2) sessions during the program, my probation officer will be notified of such absences. If I miss more than five (5) sessions during the program, I will be terminated from the program and referred back to my Probation Officer. Tardiness of more than five (5) minutes at any session counts as an absence. I must make arrangements to make up any sessions I miss. If I miss either of the first two orientation sessions, the enrollment is cancelled and I must re-register for another class.

5. I understand I will furnish a copy of my police report no later than four weeks from the date of this contract, to not do so will result in suspension from class, count as an absence for that session and will be reported to my probation officer.

6. I understand I am not to consume alcohol or use drugs prior to coming to group and to do so will result in suspension from class, count as an absence for that session and will be reported to my probation officer.

7. I understand my counselors/facilitators will report my attendance, any acts of violence and an evaluation of my participation and progress to my Probation Officer.

8. ____I understand DVCIS will contact _____(victim) to provide him/her with information regarding the program content and victim services.

9. I agree to pay __10____ per session at the time of each session. ·The payment should be by check or money order, made out to "CPI". If I want insurance reimbursement, that is my responsibility. If a check is returned, the charge is $25 and only money orders will be accepted for the rest of the program. If a session is missed, the payment for that session is still due and will be paid at the next session. If I need to attend make-up classes, I will be required to pay my per session fee for each make-up class I attend and a $20 overall processing fee.

10. DA I understand that I must notify DVCIS of any changes regarding: address, phone number, probation officer, employment, marital/relationship status.

11. DA I understand that violation of Conditions of Probation or Restraining Orders are grounds for removal from the group and referral back to my Probation Officer.

12. DA I have read and agree to comply with the Program Rules.

13. DA I AGREE NOT TO BE VIOLENT WITH ANY PERSON DURING MY PARTICIPATION IN THE DVCIS PROGRAM. To do so will result in immediate termination from the program.

I have read this contract and understand my requirements with the DVCIS Program

Participant _____          Date __4-21-95__

Witness _____

# Domestic Violence Counseling and Intervention Program

## Registration

Date _4/21/95_

Name _Debbie Alley_ Date of Birth _12/26/66_ Phone _297-9125_

Address _55 So. 11th St._ City _San Jose_

State _CA_ Zip _95112_ Phone _297-9125_

Referred by: _____ Pretrial Services _____ Probation Order _____ Court Order

_✓_ Other (Explain) _Phone Book - White Pages_

___African American ___American Indian ___Asian _✓_Caucasian___Hispanic ___Other

Circle Highest Level of Education:

1 2 3 4 5 6 7 8 9 10 11 (12) 13 14 15 16  AA  BA/BS  MA/MS  Ph.D

Employed _____Yes _✓_No  Employer_____

Work Phone_____ Gross Income per Month_____

Victim Name _Robert Gerkin_ Date of Birth _____/_____/_____

Address _Same_ City_____

State_____ Zip_____ Phone_____

___African American ___American Indian ___Asian ___Caucasian ___Hispanic _✓_Other
_Japanese / German_

Circle Highest Level of Education:
_Not sure_
1 2 3 4 5 6 7 8 9 10 11 12 13 14 15 16  AA  BA/BS  MA/MS  Ph.D

Currently Living with you?_____ If not, separated since _____

Minors living in your household:

| Name | Age | F/M | Relationship to you |
|------|-----|-----|---------------------|
| _Dominique_ | _3_ | _F_ | _Daughter_ |
| | | | |
| | | | |

# BATTERER'S PROGRAM INTAKE CHECK LIST

_____ 1. Interview fee collected. Amount _____ 35710

_____ 2. Gave client a copy of the contract and <u>program rules</u>.

N/A 3. Sent Probation Officer a copy of the contract.

_____ 4. Changed ≠ of openings available on the board.

N/A 5. Special circumstances to be noted in data base:

Below are examples of abuse people have reported. Please describe the abusive acts you have committed.

1. **Physical Abuse**

| Type | Yes | No | How Often | Comments about physical abuse |
|------|-----|-----|-----------|-------------------------------|
| Slapping | ✓ | | | |
| Punching | ✓ | | | |
| Choking | | ✓ | | |
| Pulling Hair | ✓ | | | |
| Pushed | ✓ | | | |
| Restrained | ✓ | | | |
| Kicked | ✓ | | | |
| Used a Weapon | ✓ | ✓ | | |
| Threw Something | ✓ | | | |
| Other | | | | |

2. **Intimidation:** (Frighting with certain looks, gestures, actions, smashing things, destroying property or pets)

   Yes.

3. **Emotional Abuse:** (Putting him down, calling him names, humiliating, making him feel guilty)

   yes

4. **Isolation:** (Keep him from going to places he chooses, work, school, seeing family, friends, men's groups, etc. Listen to his phone conversations, open mail. Follow him around. Ask questions about his whereabouts. Jealousy.

   Tried

5. **Minimizing, Denying and Blaming:** (Making light of the abuse, saying it didn't happen, saying it is his fault

   Yes

6. **Using Children:** (Making him feel guilty about children, using visitation to harass him, threatening to take away the children.)

   No

Childhood History:

How many brothers? _2_ How many sisters? _1_ Your birth order? (1st, 2nd, etc.) _4th_
_Brothers + sisters are a lot older. — 2.3 father 2 oldest 1 father recently to mom_
What method of discipline was used in your childhood home? _Sub Mother but partial_
_descipline other, so client was an angel. Yell, swearing, difficult face_
_older brother — hits w/ hanger, spoon. She + 9 br_
Who administered the discipline? _4 mother_ Were you ever beaten? _yes_ _shave a ya_
_who left_
_continually_  { _abusive mother_ }  _before her_
neglected? _yes_ sexually abused _yes_ ? _with._
_but not (physically_
What problems did you see in your family? (Financial, single parent, abuse, alcohol, drugs,
untimely death, suicide, legal conflicts)
_Single parent family. Mother abusive & denies. client says_
_mother uses drugs. No contact w/ father. Mother beautiful._

History of abuse

Give a brief summary of the incident that got you referred to a domestic violence program? _she was comfortable with the guy._
_Took trip to Oregon to show mother new baby (3 yrs ago). Thought about_
_killing her, killing him. Went to Police. She had been drunk + doing drugs_
_w/ girlfriend. 3-4 mos ago thru phone @ him — it flew back hit her —_
_she reported + police booked had rose this._
Did your partner need medical attention? ____Yes __✓__ No. If yes, what kind of medical
attention:_____
_Has case_
_judge_
_names._

Worst violent incident you have been involved in with a partner:_____
_____
_Robert._
_looking @_
_____ _45-50 y_
Was there violence in previous relationships? __✓__ Yes _____ No   If yes, explain: _2 past_
_____ _felonies_
_____
_____ _Thought_
_____ _killing a_
Did you witness physical violence between your parents growing up? _____ Yes __✓__ No _for drug_
_this !_
If yes, explain: _Mother abusive_
_____
_____

How do you discipline your children? _Yell_
_____
_____

7. **Female Privilege:** ( ... ating him like a servant, acting like t ... "master of the castle", making all the big decisions, telling him what his job/role is.)

*yes*

8. **Economic Abuse:** (Preventing him from working outside the home, making him ask for money, not letting him know the family income, taking his money.)

*no*

9. **Coercion and Threats:** (Threatening to take away the children, to harm him or his family or friends, to report to welfare, to destroy property, forcing him to drop charges, making him do something illegal, threatening to commit suicide)

*yes*

Do not write below this line:
----------------------------------------------------------------------

Interviewer comments:

*Suicide Risk*

*Severe past history of violence*

*Childhood Abuse*

*Appear tense, anxious*

*[illegible] relation issue — but present consistent w/ PTSD*

Interviewer summary of police report: *N/A — Volunteer*

*[illegible]*

Interviewed by _____ Date 4/2/95

08/25/95   11:39   ☎408 248 5974        D. A. LEMPERT                      ☐002

## AUTHORIZATION FOR RELEASE OF INFORMATION

TO:    Community Psychotherapy Institute

       940 Saratoga Avenue #105

       San Jose, CA 95129

RE:    Debbie Alley, aka Deborah Alley,
       aka Deborah Quinn

This will authorize you to give the LAW OFFICE OF DENNIS ALAN LEMPERT, through its representative, orally or in writing, by photostat or otherwise as requested, all information regarding:

__X__ 1.    MY ENTIRE MEDICAL CHART ~~AND/OR ANY/ALL RECORDS~~ including all documents relating to my medical/dental histories; pain; impairment; medication; health; complaints; symptoms; examinations; findings; diagnosis; prognosis; sign-in sheets; x-rays; MRI's; photographs; treatment; physical therapy; reports; notations of telephone calls; billing records and records of payment; including without limiting the generality of the foregoing, all correspondence including but not limited to other written or graphic material furnished by other health care providers or insurers.

__X__ 2.    My history, billing services rendered, treatment or diagnosis for psychiatric or emotional reasons, psychological or psychiatric testing or evaluation, or for alcoholic or drug abuse;

_____ 3.    My employment, including the nature, extent, duration, or wages to me; work performance evaluation; attendance; application for hire, job description; duties; qualifications; on the job injuries; and information regarding worker's compensation claims.

__X__ 4.    Any and all accident reports or investigations thereof.

Copies of this authorization may be used as originals. The purpose of this information is for purposes of investigation or evaluation regarding the claims for which the law firm of DENNIS ALAN LEMPERT is representing me. I understand that I have a right to receive a copy of this authorization upon my request. This authorization is to be considered a withdrawal of any prior authorizations executed by me. This authorization is effective immediately, and shall remain valid for two years following the date below.

DATED: _5-10-95_    _Debbie Alley aka Quinn_
                    Signature  Deborah

                    _Debbie Alley aka Quinn_
                    Print Name

                    _Deborah_

08/25/95  11:38  ☎✝°° 248 5974      D. A. LEMPERT                    ✆001

TELEPHONE (408) 249-5152

TELECOPIER (408) 248-5974

LAW OFFICES OF

# DENNIS ALAN LEMPERT

———

DENNIS ALAN LEMPERT                    100 SARATOGA AVENUE
DEIDRA L. AUSTIN                        SANTA CLARA, CALIFORNIA 95051-7305

## FAX TRANSMITTAL FORM

THE INFORMATION CONTAINED IN THIS FACSIMILE IS CONFIDENTIAL AND IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHOM IT IS ADDRESSED. IF YOU ARE NOT THE INTENDED RECIPIENT, OR THE PERSON RESPONSIBLE FOR DELIVERING IT TO THE INTENDED RECIPIENT, DO NOT USE OR DISCLOSE THIS FACSIMILE.

IF YOU HAVE RECEIVED THIS FACSIMILE IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE, AND RETURN THE ORIGINAL TO OUR OFFICES VIA U.S. POSTAL SERVICE. THANK YOU.

Date: 8/25/95
Time: 12:25 am/pm

From: Dennis Lempert                    Total Pages  2
                                        (Including this page)
Re: Debbie Alkey

Recipient # 1:                          Recipient # 2:

To: J. Herwick                          To: _____

Fax Number: 961-5899                    Fax Number: _____

The fax is being sent to you for your:
Information_____ Approval_____ Review_____ Use  ✓  Signature_____

Please Respond:
By Telephone_____ By Fax_____ By Overnight Mail_____ By Regular Mail_____

Urgent Reply or action necessary_____ Please reply or acknowledge receipt ASAP_____

Message:_____
_____
_____

IF YOU DO NOT RECEIVE THE INDICATED NUMBER OF PAGES SENT, PLEASE CALL SENDER AT ONCE AT (408) 249-5152

                                        Fax sent by: _____

[:\lawoffic\faxform

# PROOF OF SERVICE BY MAIL

I, __ROBERT EUGENE GERKIN__ , AM A RESIDENT OF FOLSOM STATE PRISON IN THE COUNTY OF SACRAMENTO, STATE OF CALIFORNIA: I AM OVER THE AGE OF 18 YEARS, AND I AM /AM NOT A PARTY TO THIS ACTION.

MY PRISON NUMBER IS: __J-79986__

MY PRISON ADDRESS IS: P.O. BOX 950, Folsom, Ca. 95763

ON __MARCH 20, 2008__ ,    I SERVED A COPY OF THE FOLLOWING DOCUMENT:

PETITION/MOTION: 60-B FOR RELIEF FROM JUDGEMENT UNDER: FRC, P, (b)

ON THE FOLLOWING PARTIES BY PLACING THE DOCUMENTS IN A SEALED ENVELOPE WITH POSTAGE FULLY PAID, IN THE UNITED STATES MAIL, IN A DEPOSIT BOX SO PROVIDED AT FOLSOM STATE PRISON (MAILBOX RULE), FOLSOM, CALIFORNIA, ADDRESSED AS FOLLOWS:

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
450 Golden Gate Ave.
San Francisco, CA 94102-3483

ATTORNEY GENERAL's OFFICE
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102

THERE IS DELIVERY SERVICE BY THE UNITED STATES MAIL AT THE PLACE SO ADDRESSED, AND/OR THERE IS REGULAR COMMUNICATION BY MAIL BETWEEN THE PLACE OF MAILING AND THE PLACE SO ADDRESSED.

I DECLARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED __MARCH 20 , 2008__ ,    AT FOLSOM, CALIFORNIA.

Robert E Gerkin

ROBERT E GERKIN J-79956
Folsom State Prison
Post Office Box 950
Folsom, CA 95763



RECEIVED

MAR 24 2008

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
450 Golden Gate Ave.
San Francisco, CA 94102-3483